# IN RE APPEALS BY AMERICAN OIL COMPANY AND OTHERS v. CITY OF ST. CLOUD.

206 N. W. 2d 31.

March 23, 1973—No. 43613.

*James W. Hoolihan,* for appellants.

*Richard J. Ahles,* City Attorney, and *Thomas L. Dueber,* Special Assistant City Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

This is a consolidated appeal from judgments of the district court in effect affirming assessments by the city of St. Cloud for the construction of a sanitary sewer in said city.

The facts are not in dispute. Upon the petition of Delco Development Company for the construction of a sanitary sewer to serve a new area it was developing, the city proceeded to furnish such service. Located in the Delco area was a shopping center. Extending out from the Delco land there were about 500 acres not yet served by a sanitary sewer. Appellants in this proceeding own land in that area. The land owned by appellants was largely vacant farmland at the time of the assessment, but it was estimated that it would soon be developed and the city engineer and the council came to the conclusion that about one-half of the area would be developed as residential and the other half as industrial property. Shortly before the assessment, the entire tract was annexed to the city, and at the time of such annexation and at the time of the assessment all of the land involved in this proceeding was zoned as single-family residential.

Anticipating that when the whole tract was developed it would require sewer service, the city built a 21-inch trunkline as part of the extension of the sewer to the Delco property. Had it not

been for the projected necessity for sewers in the rest of the land involved, an 8-inch trunkline might have been sufficient. But the council, after considering the recommendation of the city engineer, concluded that it would be far cheaper to install a 21-inch trunkline at the time the sewer to the Delco property was built than to build a duplicate system later when sewers were needed to serve the remaining part of the area.

Public hearings were held, both on the project before the city determined to proceed with it and on the assessment after the project was completed.

The total cost of the project was $138,319.20. Of this amount the sum of $40,908.90 was assessed against the property that was immediately serviced by the sewer and the balance, amounting to $97,410.30, was assessed against the balance of the 500 acres in the amount of $195 per acre for indirect benefits although the sewer was not yet extended into the area, nor were there plans to extend the sewer in the immediate future. The trial court found, and the evidence amply sustains this finding, that all of the property was benefited by more than $195 per acre. From the testimony of the city engineer it is to be gathered that the actual benefit to some of the property was much greater than $195 per acre but that the minimum benefit to any of the property was at least that amount. The city engineer testified that the city could not assess the property benefited more than $195 per acre for the reason that the city would then make money on the project, which it could not do, and for that reason it was decided that all of the property would be assessed at the same rate. Apparently, it is the contention of appellants that this method of assessment was improper for the reason that some of the parcels would benefit more than others by the trunkline that was built, and that some of the land would not benefit at all because it was too far away.

It is apparent from reading a rather lengthy record that the city council thoroughly considered the matter before it decided to proceed with the construction of the then oversized trunkline

in order to service the whole area, when it became necessary, without building a duplicate system. The assessment for the property immediately benefited was based on the cost of a 12-inch trunkline; the assessment for the property indirectly benefited was based on the additional cost of putting in the 21-inch trunkline that would be sufficient to serve the area assessed for indirect benefits when such service became necessary. The testimony of the engineer in that respect is as follows:

"Q. The basis of the direct assessments is the cost of a 12 inch line where in fact you did put in a 24 inch line for two block [sic] and a 21 inch line for three blocks?

"A. Yes, the direct assessment was set at a cost per foot which we determined to be the normal cost incurred when you simply extend a 12 inch main which would average—under average conditions."

We think the testimony of the engineer probably explains the thinking of the council better than we can express it. He testified:

"The total area service[d] consisted of approximately 500 acres. On that 500 acres we estimated we would have a residential population of 5000 people, and also estimated that we would have some commercial and industrial development on approximately one-half of that total acreage, so that we had approximately 250 acres on which we anticipated some commercial and industrial type of development, and we have a 5000 population. Running through a mechanical calculation on this first of all we had a population of 5000, and we set that the average daily flow from that population would be 100 gallons per capita per day, for a total flow from the residential population of—an average total average flow of 500,000 gallons per day. Then looking at the commercial and industrial development area we set—we say approximately 250 acres of commercial and industrial development, and from the commercial and industrial development we expected an average flow of about 4500 gallons per day per acre,

giving a total average flow from the commercial and industrial area of a million 125 thousand gallons per day; then adding together the flow from the residential and from the commercial and industrial development we took 500,000 gallons per day plus the 125 for a total average estimated daily flow of 1,626,000 [sic] gallons per day; then this is a trunk sewer which must be designed to take care of a peak flow under all conditions rather than an average daily flow, we used a figure of 2.5, so we took 1,625,000 gallons per day times the peak factor of 2.5 and said that we had to design a sewer with a capacity of 4,062,000 gallons per day, and in reviewing our designed statistics we found that a 21 inch sewer installed at the grade .001, one foot per foot has a capacity of 4.1 millions [sic] gallons per day, and so this is what was used."

With respect to the area assessed for indirect benefits, the engineer testified:

"It was my recommendation or my analysis that the entire area did benefit by the availability of sewer service; and regarding the question, the value of that benefit it was my analysis and my recommendation to the council that the benefit was in excess of $195.00 per acre, but that we were limited to assessing $195.00 per acre by the rule that the city cannot make a profit on the project."

■■■ Apparently, appellants contend that inasmuch as the property involved is all zoned as single-family residential and, furthermore, that the city has no immediate plans for extending sewer service into the area assessed for indirect benefits, no benefits are received that would increase the market value of the property. We think this position is untenable. While present use may be considered, it is not controlling. See Village of Edina v. Joseph, 264 Minn. 84, 95, 119 N. W. 2d 809, 817 (1962), where we said:

"Respondents claim that the present residential use of property is controlling as to benefits. This has never been the law in

this state. The doctrine that the present use is not controlling in determining benefits in a special assessment levy has often been expressed by this court beginning with our early decisions and repeated in In re Assessment for Improving Superior Street [172 Minn. 554, 216 N. W. 318 (1927)], and Qvale v. City of Willmar [223 Minn. 51, 25 N. W. 2d 699 (1946)]."

The evidence in this case sustains a finding that the area assessed for indirect benefits is of such a nature that the whole area will reasonably soon be developed for either residential or industrial use. When such development occurs, the whole property will require sewer service. In Quality Homes, Inc. v. Village of New Brighton, 289 Minn. 274, 183 N. W. 2d 555 (1971), we reversed the trial court in part for failing to hold that nonabutting property may be assessed for part of the cost of a trunk sewer which would ultimately serve such property. We said (289 Minn. 281, 183 N. W. 2d 559) :

"We hold, reversing the trial court, that the assessment upon appellants' property for the trunk sewer was invalid because it demonstrably exceeded the special benefits of the improvement. The assessment was imposed only upon properties immediately taken into the system, wholly without regard to the fact that the trunk sewer was designed to serve, and in fact now serves, non-assessed property within the entire drainage district served by that trunk."

In the above case we cited with approval City of St. Paul v. Sanborn, 176 Minn. 62, 222 N. W. 522 (1928). There, as in this case, the city assessed certain property for the construction of a trunk sewer even though the property was not tied into the sewer system. The district court found that the property received special benefits from the construction of the trunk sewer, but not to the extent of the assessment. The trial court reduced the assessment and the city appealed. In affirming the trial court, we said in Sanborn (176 Minn. 66, 222 N. W. 523) :

"* * * Of course it is not necessary that the sewer or improvement should abut the particular parcel in order to subject it to assessment for benefits, so long as some benefit by way of enhanced market value inures to it. [Citations omitted.] Benefits are to be measured by increased market value. [Citations omitted.] Market value of a lot may be increased by a potential access to a trunk sewer by the construction of a lateral or submain."

It follows that the test is whether the improvement for which the assessment was levied has increased the market value of the property against which the assessment operates in at least the amount of the assessment. The rule is stated in State ex rel. Oliver Iron Min. Co. v. City of Ely, 129 Minn. 40, 47, 151 N. W. 545, 547 (1915), as follows:

"The legislature, and this charter takes the place of a legislative enactment, may apportion special assessments according to any method it deems proper, subject only to the requirement that such assessments be uniform upon the same class of property, that they be confined to property specially benefited by the improvement, and that they do not exceed such special benefits."

In 14 McQuillin, Municipal Corporations (3 ed.) § 38.33, we find the following:

"* * * In determining whether property has been benefited, the question is whether the market value of the property has been increased by the improvement, and it is not confined to benefits conferred for the particular use to which it is being devoted at the time. However, such particular use, it is held, may be considered. * * * [T]he usual test is the increase of value for any use to which the land might be adapted."

In Village of Edina v. Joseph, 264 Minn. 84, 99, 119 N. W. 2d 809, 819, we said:

"This court has said that a rule for determining benefits may properly ignore both use and present value * * *.

"As indicated by the foregoing decisions, it is enough that the

land could be turned to purposes for which the improvement would increase its value. * * * The test is not whether property is enhanced in value for the particular purposes to which it is devoted at the time of the assessment but whether it is enhanced in value for any purpose."

■ We must bear in mind the rule that the levying of an assessment for the improvement of property is a legislative act. In In re Assessment for Widening E. Fourth St. St. Paul, 173 Minn. 67, 70, 216 N. W. 607, 608 (1927), we said:

"Laying and apportioning assessments is legislative in its nature, and an assessment made by the body charged with that duty is presumed to be lawful and correct, both as to the property assessed and the amount assessed against it; and the courts can interfere with the conclusions reached by the assessing body as evidenced by the assessment only when they are clearly shown to be erroneous."

In Quality Homes, Inc. v. Village of New Brighton, 289 Minn. 274, 285, 183 N. W. 2d 555, 562, we said:

"Determination of benefits and apportionment of assessments is a legislative function. If the question of benefits and apportionment is a matter upon which reasonable men may differ, the determination by the legislative body or council must be sustained."

See, also, In re Improvement of Third Street, St. Paul, 185 Minn. 170, 240 N. W. 355 (1932); Village of Edina v. Joseph, *supra,* where we refer to the levying of an assessment as a legislative act.

Mr. Michael Donohue, a member of the city council who is also an attorney, testified regarding the necessity of installing the oversized trunkline at this time in order to service the area in the future when it becomes necessary:

"A. * * * We determined that we would be remiss in our duty if we would not plan for the entire area while doing and in-

stalling this specific improvement in view of the fact that at a later time when immediate need by reason of development would arise would we not over-size at this time we would have had to put in another sewer which would be a duplication.

\* \* \* \* \*

"Q. \* \* \* [Y]ou did not consider in arriving at your decision at what point in the future this line would be extended to serve this area, any particular parts of it?

"A. We considered it would be in the fairly near future, and in fact both the township, or the township initiated a resolution with the city under the orderly annexation procedure, that this area was urban or shortly to become urban in character and in fact evidently was developed to some degree, and obviously the direction of growth the city was taking, both Delco to the north coming south, and the growth of the city generally to the west, that this would soon become ready for development if not already been [sic] developed, ready for development with the development of the sewer.

"Q. You say you assumed would soon become ready for development with the sewer line, how soon would you say it would be?

"A. We did not put any time element on it, I think the fact is were the then existing circumstances, the fact this was petitioned to be annexed because it was urban, the fact that there was development going on already in the area, and the fact that it was capable of development, and there was need for development in the area around St. Cloud."

While the property owners and those interested indirectly in the property testified there was no benefit to the land assessed, the only impartial expert real estate witness who was not interested in any of the land affected was called by the city. Jerome Cyphers, who both parties concede was well qualified in appraising real estate, testified that the installation of sanitary sewers would definitely increase the value of those lands which could be served in the future by the trunkline. In that respect he agreed

with the city council. He testified that the improvement would increase the market value of each parcel of property assessed for indirect benefits in an amount equal to or in excess of $195 per acre and that basically all the land in the disputed area would benefit equally from the trunkline. In that respect he testified as follows:

"Q. [On cross-examination by Mr. Hoolihan.] My question is, in your opinion is there a greater increase in market value because of the fact the availability is closer and more likely to come to a parcel within 400 feet than one a mile away?

"A. I think I have to say no, Jim, to it. If you are 400 feet away it takes a period of time to extend the sewer into it as long as it is not directly serviced by that. Being a mile away perhaps that sewer could be extended almost as rapidly to that point.

"Q. And if because of development, it isn't very likely a mile away property would be serviced as quickly and as soon as the one 400 feet away, is it still your opinion there is no increase in the market value because of availability?

"A. I think you are assuming here that—

"Q. I am assuming something, and I am asking you to give me an opinion based on that assumption?

"A. You said you assume that the property a mile away will not develop as quickly as the property closer in.

"Q. I did not say that, I said it would not be serviced as soon by the sanitary sewer?

"A. Then I misunderstood your question, will you restate it.

"Q. Are you saying regardless of how close you are to the service in terms of distance and time and need, that all of the area that can be serviced by sanitary sewer later benefits equally just by the fact that it can be serviced at some time?

"A. Basically I think with this indirect sewer I have to say yes to that, because it is a indirect thing, you are not immediately there. It is different than putting in a sewer directly into the property."

Apparently appellants' line of thinking is that the cost of the larger trunkline would have to be assessed against each parcel comparatively, based on the increased value that parcel would receive in comparison to that which other parcels would receive, even though the evidence sustains the fact that benefit to all parts of the area was at least $195 per acre. It is obvious that this line of thinking, if the court were compelled to accept it, would result in an increased assessment against some parcels in the area whereas the assessment against others might be decreased. Appellants here are all in this case together. The cases have been consolidated both in the trial court and before this court. They advance the same argument even though the result of its acceptance would hurt some and help others. Surely those property owners whose assessments might be raised would have difficulty in complaining about the assessment that was levied, which is lower than they could expect if the benefit to each parcel on a comparative basis were adopted. Those whose assessment might be lowered would benefit from such computation if it could be made. The same attorney represents all appellants, and he might find it difficult to justify a result under which some of his clients would be assessed more than they are under the city's plan. However, in this case the evidence sustains the court's finding that the market value of the property affected was increased by at least the amount of the assessment.

■ While it is true that the city could have paid the extra cost of the enlarged trunk sewer out of ad valorem taxes and then assessed such cost against the property as the sewer service became available, under our laws it was not necessary for the city to do so. Minn. St. 429.051 reads in relevant part:

"The cost of any improvement, or any part thereof, may be assessed upon property benefited by the improvement, based upon the benefits received, whether or not the property abuts on the improvement * * *. * * * The municipality may pay such portion of the cost of the improvement as the council may determine from general ad valorem tax levies or from other reve-

nues or funds of the municipality available for the purpose. The municipality may subsequently reimburse itself for all or any of the portion of the cost of a water, storm sewer, or sanitary sewer improvement so paid by levying additional assessments upon any properties abutting on but not previously assessed for for the improvement, on notice and hearing as provided for the assessments initially made. To the extent that such an improvement benefits nonabutting properties which may be served by the improvement when one or more later extensions or improvements are made but which are not initially assessed therefor, the municipality may also reimburse itself by adding all or any of the portion of the cost so paid to the assessments levied for any of such later extensions or improvements, provided that notice that such additional amount will be assessed is included in the notice of hearing on the making of such extensions or improvements. The additional assessments herein authorized may be made whether or not the properties assessed were included in the area described in the notice of hearing on the making of the original improvement."

When the sewer is finally extended from the trunkline for which the assessment is now being made, the property then serviced will undoubtedly be assessed on a front-foot basis for the sewer so established. The owners will already have been assessed for the trunkline, so that will not be repeated. In any event, if not now assessed for a share of the trunkline, they would eventually be assessed for their share as sewer service is extended to them.

Under these circumstances we feel satisfied that the findings of the trial court that all the property involved was benefited more than the amount of the assessment levied against it is amply sustained by the evidence and the method of assessment is permissible under our laws.

In view of our decision on the legality of the assessment we see no need of discussing other issues raised by appellants.

The decision of the trial court is affirmed.